## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | | |
|---|---|---|
| BUFFALO MOLDED PLASTICS, INC., | : | Case No. 04-12782 TPA |
| d/b/a/ ANDOVER INDUSTRIES, | : | |
| Debtor, | : | Chapter 11 |
| | : | |
| BUFFALO MOLDED PLASTICS, | : | Adversary No.  05-01041 TPA |
| INC., d/b/a/ ANDOVER | : | |
| INDUSTRIES, | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| OMEGA TOOL CORP., | : | |
| Defendant | : | |

*Appearances: Willard E. Hawley, Esq. for Debtor/Plaintiff*
*Ryan D. Heilman, Esq. for Defendant*


### _MEMORANDUM OPINION_


The matters before the Court are Plaintiff Buffalo Molded Plastics, Inc.'s *Motion for Summary Judgment* and Defendant Omega Tool Corp.'s's *Motion for Partial Summary Judgment*. For the reasons expressed below, both motions for summary judgment shall be denied.[1]


### *FACTS*


Plaintiff Buffalo Molded Plastics, Inc.  ("Buffalo Molded") produces production parts for use in automobiles and sells its part directly to automobile manufacturers.  Among its customers

---

[1]  The Court's jurisdiction was not at issue.

are General Motors and DaimlerChrysler. Defendant Omega Tool Corp. ("Omega") manufactures

plastic injection molds for use in producing the production parts made for the automotive industry.

Buffalo Molded contracted with DaimlerChrysler to produce parts for what was known as the ND

and NM programs.[2] Buffalo Molded then arranged with Omega to build the molds necessary for the

tooling. Omega was to manufacture the tools, which Plaintiff would pay for but the ultimate

purchaser of the ND tools was DaimlerChrysler. By October, 2004, Buffalo Molded owed Omega

$1,083,370 for the ND Tools. It also continued to owe for the NM Tools. As of October, 2004, a

total amount of approximately $3,075,117 was owed or scheduled to become owing to Omega by

Buffalo Molded including amounts due for the NM tooling.


Prior to the filing of the Debtor's chapter 11 petition, Omega was in possession of

certain tooling regarding the ND program called the "ND Cargo Sill". It also was in possession of

two of the tools associated with the NM Program. On October 13, 2004 two wire transfers were

made to Omega from Buffalo Molded's account at Comerica Bank. The aggregate amount of the

transfers totaled $1,083,370. After receipt of the funds, on or about October 14, 2004, Omega

shipped the ND Cargo Sill to Buffalo Molded at its Meadville, PA location. On October 18 and 19,

2004, certain NM Tools were shipped back to the Debtor by Omega. Omega had previously

delivered NM tools to Debtor on or about August 30, 2004.


Buffalo Molded filed its voluntary Chapter 11 petition on October 21, 2004. After

the filing of the petition, on October 27, 2004, Omega filed a financing statement asserting a lien

---

[2]      Omega also built molds for Buffalo Molded in connection with a Saab program for General Motors.
Through the course of the adversary proceeding, the dispute regarding the Saab Tools was withdrawn.

on the NM Tools pursuant to *Ohio RL 1332.32 et. seq.*  The financing statement was filed with the Pennsylvania Department of State.

On March 7, 2005 Buffalo Molded filed its complaint against Omega seeking avoidance of the wire transfers on the basis that the transfers constitute preferences.  (*Docket No. 1*).  The complaint, which was amended on May 18, 2005, (" the Amended Complaint"), seeks avoidance of the transfers as preferences based upon *11 U.S.C. §547(b)* in Count One.  (*Docket No. 21*) . Count II seeks recovery of the transfers pursuant to *11 U.S.C. §550.  Id.* In Count III, Debtor seeks to disallow the claims pursuant to *11 U.S.C. §502(d)*.  Declaratory relief is also sought in Count IV that the claims of Omega are unsecured claims.  *Id.*

In its Answer to the Amended Complaint, Omega raises numerous defenses.  (*Docket No. 22*).  Those defenses forming the basis for of its motion for summary judgment are:  the payments were not transfers of a Debtor's interest in property; the earmarking doctrine bars Debtor's assertions; the payments were made in the ordinary course of business; the transfers were contemporaneous exchanges and new value was provided by Omega; Omega's interests are secured by a lien.  *Id.*

On November 23, 2005, Buffalo Molded filed its Motion for Summary Judgment.  On the same date, Omega filed its Motion for Partial Summary Judgment seeking summary judgment regarding Counts I through III of the Amended Complaint.

## *DISCUSSION*

The standard for determining a  motion for summary judgment is set forth in *Fed. R. Civ. P. 56*, which is made applicable to adversary proceedings through *Fed. R. Bankr. P. 7056*. Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions that are part of the record, in addition to affidavits, demonstrate the absence of any genuine issue of material fact thereby entitling the moving party to judgment as a matter of law. *Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). An issue of material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Dongelewicz v. First Eastern Bank*, 80 F.Supp.2d 339, 343 (M.D. Pa. 1999). Summary judgment is appropriate if no material, factual issue exists and the only issue before the court is a legal issue. *EarthData Int'l of N.C., L.L.C. v. STV Inc.,* 159 F.Supp.2d 844 (E.D.Pa. 2001); *In re Air Nail Co., Inc.* 329 B.R. 512 (Bankr.W.D.Pa. 2005). In deciding a motion for summary judgment, the Court must view the facts in a light most favorable to the non-moving party. *United States v. Isley*, 356 F.Supp.2d 391 (D.N.J. 2004). The moving party, moreover, bears the initial responsibility of stating the basis for its motions and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 325. Once the moving party satisfies its burden of establishing a *prima facie* case for summary judgment, the non-moving party must respond with contrary evidence and do more than raise some metaphysical doubt as to material facts, otherwise judgment will be entered in favor of the movant. *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998) (quoting *Masushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). No issue for trial exists, in fact, unless the non-moving party can adduce sufficient evidence favoring it on the disputed

4

factual issue such that a reasonable jury could only return a verdict in its favor. *See Celotex*, 477 U.S. at 322. "It is important to note that, even if a genuine factual dispute is shown to exist, such showing may not necessarily suffice to preclude the entry of a summary judgment. Indeed, the mere existence of *some* alleged factual dispute will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."   *In re Allegheny Health, Educ. and Research Foundation,* 321 B.R. 776, 789 (Bankr.W.D.Pa. 2005).

Buffalo Molded seeks summary judgment on the basis that all of the requirements of preference have been met and Omega's defenses are insufficient or inapplicable.[3]  Specifically, as to Omega's defenses, it is argued that the transfers: exceed the amount of new value; were not in the ordinary course; and, were not earmarked. Omega primarily makes three arguments in its motion asserting defenses to the assertion that the transfers were preferential: the ear marking doctrine; the new value defense; and, the contemporaneous exchange defense.

### *Avoiding Preferential Transfers - 11 U.S.C. §547*

---

[3]       *11 U.S.C. §547(b)* provides, with certain exceptions not applicable here, that where a transfer of an interest of the debtor in property may be avoided where the transfer was:

    (1)       to or for the benefit of a creditor;
    (2)       for or on account of an antecedent debt owed by the debtor before such transfer was made;
    (3)       made while the debtor was insolvent;
    (4)       made --
          (A)       on or within 90 days before the date of the filing of the petition or
          (B)       between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
    (5)       that enables such creditor to receive more than such creditor would receive if –
          (A)       the case were a case under chapter 7 of this title;
          (B)       the transfer had not been made; and
          (C)       such creditor received payment of such debt to the extent provided by the provisions of this title.

Buffalo Molded asserts that there is no material dispute of fact that the transfers to Omega meet the requirements for a preference as set forth in *11 U.S.C. §547(b)*. The transfers were to or for the benefit of Omega who was a creditor of the Debtor at the time of the transfers. *(11 U.S.C. §547(b)(1))*. Second, the transfers were for or on account of an antecedent debt owed by the Debtor to Omega. At the time of the transfers on October 13, 2004, Buffalo Molded owed Omega in excess of $1.2 million dollars. (*11 U.S.C. §547(b)(2)*). Third, the Debtor was insolvent at the time of the transfers. In fact, Buffalo Molded filed its bankruptcy petition only eleven days after the transfers. (*11 U.S.C. §547(b)(3)*).[4] Fourth, the transfers were made on October 13, 2004 and the petition was filed on October 21, 2004, within ninety days of the filing. (*11 U.S.C. §546(b)(4)(A)*). Finally, the transfers enabled Omega to receive more than it would have if the debtor was in a chapter 7 liquidation proceeding. (*11 U.S.C. §547(b)(5)*). No specific evidence was provided on this final element by the Debtor beyond assertions that after payment to secured and priority creditors, general unsecured creditors in this case would receive a pro rata, if any, distribution. Omega does not appear to dispute this particular conclusion. In addition, this Court is generally aware and has been mindful throughout this case of the danger of administrative insolvency. Accordingly, Debtor's conclusion in this regard does not appear to be in dispute.

With the few exceptions noted, Omega does not directly dispute that the elements set forth in subsections (1) through (5) of *11 U.S.C. §547* have been met. Rather, Omega argues that due

---

[4] Further, at the oral argument on the summary judgment motions, counsel for Omega did not dispute insolvency. Although Omega indicates in its *Answer to First Amended Complaint* that Buffalo Molded was solvent at the time, (*Answer, Affirmative Defenses, ¶6*), Omega has not introduced any filing or evidence that would rebut the presumption of insolvency pursuant to *11 U.S.C. §547(f)*.

to the earmarking doctrine, the wire transfers were not property interests of the Debtor.  Therefore, Omega contends that if the transfers to Omega did not involve transfers of the Debtor's interest in property, as required by the language of *11 U.S.C. §547(b)*, the initial statutory predicates for a preference have not been met.  Thus, for the reasons stated below regarding the application of the earmarking doctrine, a genuine issue of material fact exists as to whether the transfers fall within the statutory elements of *11 U.S.C. §547(b)* making summary judgment on this issue inappropriate.  In addition, Omega asserts its other defenses of new value, contemporaneous exchange and ordinary course of business.

<u>*Application of the Earmarking Doctrine*</u>

The earmarking doctrine is an equitable doctrine that provides that funds are "earmarked" for a creditor where a new lender makes a loan to enable a debtor to pay the specific debt.  It is generally considered to be a "judicially-created doctrine said to apply when a new creditor pays a debtor's existing debt to an old creditor." *In re Moses*, 256 B.R. 641, 645 (10th Cir. 2000). The rationale behind the doctrine is that the funds paid by the new creditor do not become part of debtor's estate where the transfer merely substitutes one creditor for another.  Accordingly, the transfer is not a property interest of the debtor.  *See e.g., In re Lee*, 339 B.R. 165 (E.D. Mich.  2006); *In re Grabill Corp.*, 135 B.R. 101 (Bankr.N.D.Ill. 1991).  The doctrine originally started in the context of guarantor or codebtor cases.  It has since been extended to apply in situations beyond that of a guarantor or codebtor providing funds. However, not all courts have been willing to adopt such an extension. *See e.g., Moses,* 256 B.R. at 646 and *cases cited therein*.  The parties did not present, nor did the Court's research reveal, any case law decided by the United States Court of Appeal for the Third Circuit,

7

regarding extension of the earmarking doctrine beyond guarantor cases.  Assuming, without deciding,

that the doctrine is appropriate for application in this judicial circuit in this context, we now consider

the arguments.

It has been widely adopted that there are three requirements for the applicability of

the doctrine:

(1)     existence of an agreement between the new lender and the
        debtor that the new funds will be used to pay a specified
        antecedent debt,

(2)     performance of that agreement according to its terms, and

(3)     the transaction viewed as a whole (including the transfer in of
        the new funds and transfer out to the old creditor) does not
        result in any diminution of the estate.

*In re Bohlen Enterprises, Ltd.*, 859 F.2d 561, 566 (8th Cir.  1988).

To determine whether the loaned funds are property of the estate, courts have looked

to whether the debtor had control over the property. *Id*. at 566. If the assets were never in the debtor's

control, payment of the assets in no way diminishes the estate.  *Coral Petroleum, Inc. v. Banque*

*Paribas-London*, 797 F.2d 1351, 1356 (5th Cir. 1986) and *cases cited therein*.  For a preference to be

voided  "it is essential that the debtor have an interest in the property transferred so that the estate is

thereby diminished." *Id*.  *citing In re Castillo,* 39 B.R. 45 (Bankr. D. Colo. 1984).

*Existence of an Agreement*

Buffalo Molded had a general commercial loan agreement with Comerica Bank.

According to the deposition testimony of Robert Stoessel, the general procedure when monies were received by Buffalo Molded in its Comerica account is that the funds would be "swept" against the loan balance. *Defendant's Brief in Support of Motion for Partial Summary Judgment*, Ex. B, pp. 18, 27.  Buffalo Molded would then request a borrowing base, i.e. give Comerica instructions regarding where to transfer funds or request wire transfers. *Id*.  Upon approval of the borrowing request, Comerica would advance monies into the account and wire transfer funds out of the account. *Id*. Therefore, in order to make payments to creditors, Buffalo Molded submitted a proposed budget wire transfer request to Comerica who would then advance the budgeted amount, as a loan, to Buffalo Molded's account. Comerica would then initiate the requested and approved wire transfers to the transferees.  *Id*., p. 3.

According to Omega, it's then vice president, David Cecchin, requested that Buffalo Molded make payment for the ND Tools prior to Omega releasing them.  *Id*.  Because all funds deposited into Debtor's Comerica account were applied to the Comerica loan, Omega was not certain that funds would be readvanced after Buffalo Molded received payment from DaimlerChrysler. *Id*. Accordingly, arrangements were made with DaimlerChrysler to make payment for the ND Tools to the Debtor's account at Comerica, and the funds thereafter made available for payment to Omega for the ND Tools. *Id*.  DaimlerChrysler deposited the funds into Buffalo Molded's account at Comerica. Comerica "swept" the account and applied the funds to Buffalo Molded's prepetition loan. Comerica then readvanced the funds to Buffalo Molded and placed the amount in its account and made the two wire transfers totaling $1,083,370. *Id.*  After receipt of the funds, Omega released and shipped the ND Cargo Sill to the Debtor.

Omega asserts that the way in which it was paid was the very type of arrangement required for the earmarking doctrine. It asserted that the Debtor was required to submit for approval a detailed budget describing the purpose of the advances from Comerica. *Def.'s Br. in Supp. of Mot. for Partial Summ. J.,* p. 8. In addition to submitting budget and wire transfer requests, Omega asserts that the transfers in this instance were subject to special review and agreement that Comerica would readvance the funds for the express purpose of paying Omega. *Id.* In support, Omega refers to a letter signed by a Mr. Gregory Wernette stating that "BMP has requested and Bank agrees that the forbearance agreement budget will permit BMP to use the DCX tooling receipt to pay Omega Tool on a pass through basis." [5] Omega contends that Comerica had direct and exclusive control of Debtor's funds at all times. *Id.* at 9.

Debtor does not dispute the facts of: (1) receipt of funds from DaimlerChrysler; (2) the application of those funds to its loan with Comerica; (3) the subsequent advancement of funds from Comerica; and, (4) the ultimate payment to Omega. What is disputed by Buffalo Molded is the element of control exercised by Comerica over its financial decisions. Buffalo Molded asserts that it retained discretion to direct where and to whom its funds were to be sent. Debtor only had to inquire of Comerica to ascertain if sufficient funds were available to direct payment to a particular creditor. In this instance, Buffalo Molded argued that it was solely responsible for deciding to have the funds wired to Omega and it requested Comerica to do so at the appropriate time. Buffalo

---

[5] There is no letterhead on the referenced letter so it is not clear from the face of the letter who Mr. Wernette is employed by or what position he holds.

Molded claims Comerica did not have the authority to compel payment to a particular party. [6]

The deposition testimony of Robert Stoessel indicates that it was "ordinary" for Buffalo Molded to request that certain advances be made on the line of credit in order to pay suppliers. *Def.'s Br. in Supp. of Mot. for Partial Summ. J.,* Ex. B, p. 88. In certain situations, such as with the Debtor, Comerica would approve advances which exceeded the value of collateral which secured its interest. *Id.* at 28. However, when Stoessel was asked about the specific agreement that would allow for money from DaimlerChrysler to pay tooling invoices owed by the Debtor, he did not know specifically what agreement was being referred to. *Id.* at 30.

In order to determine control, courts consider whether the use of funds was restricted in any way by the new creditor, whether the debtor had the ability to direct who received its funds or whether it had physical control of its funds. *Moses*, 256 B.R. at 650 and *cases cited therein*. "If the debtor controls the disposition of the funds and designates the creditor to whom the monies will be paid *independent of a third party whose funds are being used* in...payment of the debt, then the payments made by the debtor to the creditor constitute a preferential transfer." *Superior Stamp & Coin Co., Inc., ,* 223 F.3d 1004, 1009 (9th Cir. 2000) *citing In re Kemp*, 16 F.3d 313, 316 (9th Cir. 1994).

Generally, it would appear from the deposition testimony of Robert Stoessel that Buffalo Molded had the ability to direct payment of its funds to the appropriate recipient. While it had to submit a budget to Comerica and seek approval, it does not appear that Comerica dictated

---

[6]        To support its argument Debtor relies on an Exhibit K which is identified as being portions of a deposition transcript of Robert Stoessel. However, it did not appear that Exhibit K was made part of Plaintiff's Motion as stated.

*which* creditor could be paid. Rather, it appears that Comerica dictated *whether* a creditor could be paid based on Buffalo Molded's financial status.  However, in this instance, the Court does not possess sufficient, specific facts to determine the true nature of the alleged agreement between Buffalo Molded and Comerica as to the control element.

Buffalo Molded contends that it was a matter of availability of funds.  Omega asserts that availability was irrelevant and that the situation was one of an overadvance to allow payment to a specific creditor. This difference cannot be reconciled on the basis of the present record.  The material presented in support of the issue does not sufficiently resolve the issue.  Accordingly, a determination of the applicability of the earmarking doctrine in this instance is not appropriate for summary judgment since a genuine dispute of material fact exists as to the issue of control.

### Performance of Agreement

Although it is not entirely clear from the present record how it was determined that the funds from DaimlerChrysler would be received by the Debtor and then used to pay Omega, there is no dispute that Omega received payment as a result of the receivable from DaimlerChrysler to Buffalo Molded.  Therefore, any agreement that Omega be paid was in fact performed.

### Diminution of the Estate

Generally, the basic concept of the earmarking doctrine is that of unsecured refinancing of unsecured debt, i.e. replacing one unsecured creditor with another.  However, where a security interest is given by the debtor to the new creditor in order to receive the funds, more than

12

the mere substitution of unsecured creditors will have occurred.  Rather, a secured creditor must replace an unsecured creditor resulting in a diminution to the estate.  David Gray Carlson and William H. Widen, *The Earmarking Defense to Voidable Preference Liability: A Reconceptualization*, 73 Am. Bankr. L .J. 591, 600 (1999). The granting of a security interest creates an exception to the earmarking defense. Earmarking does not apply in situations where secured debt replaces unsecured debt. *Moses*, 256 B.R. at 651 and *cases cited therein*.

Omega argues that this "secured" exception is not applicable because Comerica was undersecured.  Further, where the secured creditor is undersecured, citing *In re Hartley*, 825 F.2d 1067 (6th Cir.  1987) and *Superior Stamp, supra*. Omega contends there is no additional collateral obtained and therefore no diminution to the estate.  In this instance, after receiving payment, Omega claims the Debtor no longer owed Omega, an unsecured creditor, but instead owed money to Comerica, who retained a security interest in all of Debtor's prepetition assets.  The Debtor argued to the contrary, i.e., the transfers diminished its estate.  Whether Comerica is an undersecured or oversecured creditor is not clear on the basis of the present record.  Absent that fact, the Court is unable to determine whether the transfers diminished the estate.  Therefore, a genuine issue of material fact exists regarding the third element of the earmarking doctrine.  The existence of this genuine issue of material fact is further reason why summary judgment is not appropriate on the current record.

<u>*Application of the New Value Defense*</u>

13

In its *Objection to Defendant's Motion for Partial Summary Judgment,* pp. 9, 15, and *Brief in Support of Motion for Summary Judgment,* p. 5, Buffalo Molded agreed that the NM Tools delivered by Omega represent $518,000 in new value. Therefore, this fact is not in dispute. However, Buffalo Molded argued that any new value represented by the NM Tools is exceeded by the amount of the transfers, which figure Buffalo Molded claims totals approximately $544,420. This amount was determined by subtracting the value of the tools from the total transfer. Based on Omega's invoices, the value of the tools delivered to the Debtor was $538,950 (as discussed below, $518,000 plus $20,950 for the ND Tools.) The value of the transfers was $1,083,370. Subtracting the value of the tools, i.e., $538,950, from the transfer of $1,083,370, results in a balance of $544,420. *Br. in Supp. of Pl.'s Mot. for Summ. J.,* p. 5.

*Effect of "contemporaneous exchange" for ND Tools*

Buffalo Molded admits that there was a contemporaneous exchange for new value as to the ND Tools. The amount of new value as well as the process to determine that amount differs considerably between the parties. Buffalo Molded asserts that the only new value related to the ND Tools provided by Omega was as a result of engineering changes in the amount of $20,950.00. Those changes were made between October 3rd and 15th, 2004. In support of this, Debtor offers the deposition testimony of Mark Andreozzi, program manager for the ND Program, who verified that the only changes made to the tooling between October 3, 2004 when Omega received the tooling and October 15, 2004 when Omega sent the tooling back to the Debtor was the $20,950. *Br. in Supp. of Pl.'s Mot. for Summ. J.,* Ex. D. Any other value added by Omega occurred at dates prior to the transfers to Omega. *Pl.'s Obj. to Def.'s Mot. for Partial Summ. J.,* p.10. Buffalo Molded argues that

14

the tooling had previously been delivered to it and subsequently sent back to Omega for design and engineering changes. Those changes, which are evidenced by a separate invoice in the amount of $20,950, made after the tooling was returned to Omega, are what the Debtor claims constitutes new value. *Br. in Supp. of Pl.'s Mot. for Summ. J.*, Ex. D.

Omega asserts that at least as to the value of the ND Tooling known as the ND Cargo Sill, it was delivered to the Debtor in a contemporaneous exchange for the transfers. As such the defense provided by *11 U.S.C. §547(c)(1)* applies to the extent of the value of the ND Cargo Sill, that is, $416,000. Omega argues that there is no dispute that the exchange was intended to be contemporaneous and that it released and delivered the ND Cargo Sill in exchange for payment from the Debtor. Upon receipt of the October 13th payment, the ND Cargo Sill was released and delivered on October 14, 2004. Thus, according to Omega, new value on the entire amount of $416,000 for the ND Cargo Sill was provided.

It is further argued by Omega that in the plastic injection mold industry, unfinished products are routinely shipped back and forth to the customer for purposes of engineering changes, production tests and runs. Production of the ND Cargo Sill began in June 2002 and was shipped back and forth between the parties a number of times during the building process. *Defendant's Memorandum Objection and Response to Plaintiff's Motion for Summary Judgment,* p. 12. By September, 2004, Buffalo Molded had not accepted the item for final sale. Instead, the ND Cargo Sill was sent back to Omega for further engineering changes. *Id.* Therefore, Omega either retained ownership of the ND Cargo Sill or ownership reverted back to Omega when Debtor returned the tool for further engineering changes.

15

Omega relies on *13 Pa. C.S.A. §2401(4)* to support its contention that title revested in it.  The statute provides, in relevant part:

> **(4) Revesting of title upon rejection of goods or revocation of acceptance.** –A rejection or other refusal by the buyer to receive or retain the goods, whether or not justified, or a justified revocation of acceptance revests title to the goods in the seller. Such revesting occurs by operation of law and is not a "sale."

The facts of record do not sufficiently support the contention that Buffalo Molded rejected or otherwise refused delivery of the goods. In fact, it appears contradictory to Omega's own assertion that in the plastic mold industry, goods are "routinely shipped to and from the customer for purposes of engineering changes, production tests, and even for actual production runs." *Def.'s Mem. Obj.*, p. 12; *Def.'s Mot. for Partial Summ. J.*, Ex. K, Affidavit of David Cecchin, §4 ("It is typical for mold builders to deliver a single tool multiple times for the purpose of tryouts by the customer with the expectation that the mold would be returned to the tool shop for further changes and modifications.")  Alternatively, Omega argues that it retained a possessory lien on the tooling pursuant to Ohio and/or Pennsylvania statutes.  *OH R.C. §1333.31, 73 P.S. §1880.7.*

Omega contends that the transfers were made to secure immediate delivery of the ND Cargo Sill and allow production to continue, eliminate exposure to DaimlerChrysler and avoid a legal dispute regarding  ownership.  It relies upon *Lewis v. Diethorn*, 893 F.2d 648 (3d Cir. 1990), *cert. denied*, 498 U.S. 950, 111 S.Ct. 369, 112 L.Ed.2.d 332 (1990) to assert that the transfers were in return for the "freedom from risk of litigation" and were a contemporaneous exchange.  In *Lewis v. Diethorn*, the United States Court of Appeals for the Third Circuit found that where the debtor made

16

payment in exchange for the termination of a lawsuit filed by the creditor and removal of a lis pendens, the statutory requirement of a preference was not met.  The court found that such a payment was not "on account of an antecedent debt" as required by *11 U.S.C. §547(b)(2)*.  The *Lewis* decision has not been widely followed and courts not bound to follow it have declined to do so.  *See e.g. In re Bridge Info. Systems, Inc.,* 302 B.R. 41 (Bankr. E.D. Mo. 2003); *Wilcox v. CSX Corp.*, 70 P.3d 85 (Utah 2003).  In any event, its applicability for the proposition asserted by Omega is dubious in this circumstance.  At the time of the transfers, no litigation was pending or even threatened of which this Court has been made aware.  Further, Omega contends that if the sale was final and Buffalo Molded was seeking only engineering and design changes, that would suggest that Buffalo Molded paid for a product that was not suitable for DaimlerChrysler's needs.

Buffalo Molded contends, conversely, that Omega held the tooling "hostage" and would not release it without payment.  This characterization is disputed by Omega  who argues that even if true, the exchange was nevertheless contemporaneous.  Regarding Omega's argument that state statute provides it with a secured lien, Buffalo Molded argues that the Ohio statute would not be applicable because the tools were not manufactured in or delivered to Ohio.  Further, Omega claims the tooling was sent back to it only for engineering changes not because the Debtor was rejecting a final sale or refusing delivery.  Therefore, discussion regarding secured liens is not applicable.  Moreover, even if the Ohio or Pennsylvania statute were to apply, the statutes require possession as well as certain notice requirements which admittedly were not met.  Thus, under Omega's reasoning, even if Omega had met the requirements, it would only be entitled to a lien for work performed while in Omega's possession.  Upon delivery of the mold to the Debtor, the lien would be extinguished.  Thus, even if a molders' lien were found to exist, the amount of new value

regarding the ND tooling would remain at $20,950. This amount, along with new value for the NM

Tools in the amount of $544,420 would still result in a net preference claim of $497,050.


The lien statutes require possession and specific notice requirements. Omega

relinquished possession upon receipt of the wire transfers. In addition, the record is void of any facts

regarding compliance with the notice requirements. The parties involved are sophisticated business

entities that would be familiar with and expected to comply with any statutory notice requirement if

any lien was to be asserted. There is not sufficient evidence in the record to support this theory,

particularly at the summary judgment stage. Therefore, a dispute remains as to when title to the

tooling passed. While the passage of title may be a legal dispute rather than a factual one, the Court

is unable to make a determination, absent further factual development, as to the basis for sending the

tooling back and forth between the parties.


### *Application of the Ordinary Course of Business Defense*

*11 U.S.C. §547(c)(2)* provides that a transfer may not be avoided:

(2) to the extent that such transfer was

> (A) in payment of a debt incurred by the debtor in the ordinary
> course of business or financial affairs of the debtor and the
> transferee;

> (B) made in the ordinary course of business or financial affairs of
> the debtor and the transferee; and

> (C) made according to ordinary business terms;

Omega pled the "ordinary course defense" in its answer, although, it did not argue that

18

summary judgment should be granted on the basis of this defense.  Debtor, however, anticipated the ordinary course defense and asserted that summary judgment should be granted denying Omega's defense of ordinary course.

In determining whether the payments were made in "the ordinary course", the determination of what is "ordinary course of business" is a subjective one . *In re J. Allan Steel Co.*, 321 B.R. 764 (Bankr. W.D. Pa. 2005) citing *J.P. Fyfe v. Bradco Supply Corp.*, 891 F.2d 66 (3d Cir. 1989).  It must be determined whether the transfer was an ordinary one as between the debtor and creditor.  *Id.* at 771; *11 U.S.C. §547(c)(2)(B)*.  In addition, pursuant to *11 U.S.C. 547(c)(2)(C)*, the Court must look to whether the payment was made according to ordinary business terms, i.e. "the broad *range* of payment terms found in businesses similar in some general way to the creditor." *Id.* at 772.  A greater departure from the range of terms is countenanced the longer the relationship between the debtor and creditor prior to insolvency.  *Fiber Lite Corp. v. Molded Acoustical Products*, 18 F.3d 217 (3d Cir. 1994).  However, if the parties have not had a long relationship, more emphasis is placed on industry standards.  *Id.*  at 225.

> When the relationship between the parties is of recent origin, or formed only after or shortly before the debtor sailed into financially troubled seas, the credit terms will have to endure a rigorous comparison to credit terms used generally in a relevant industry.  That is because in that class of cases we lack something better to look at to verify that the creditor is not exploiting the debtor's precarious position at the brink of bankruptcy so that it may advantage itself to the detriment of other creditors who continue to extend credit within the letter and spirit of the Code, or at the very least to verify that the creditor is refraining from "unusual" action to collect ordinary debts.  In other words, in those situations there is no baseline against which to compare the pre-petition transfer at issue to confirm the parties would have reached the same terms absent the

19

looming bankruptcy.

*Id.* at 226.

The parties do not have a long history with each other.  The first order from Buffalo Molded to Omega was  for the ND Tools which are the subject of this preference action.  Subsequent to the commencement of work on the ND Tools, the parties did engage in another contract for work on a set of tools referred to as the "Isuzu Tools".  Payment for the Isuzu Tools was completed prior to the wire transfers at issue.

Because the parties had such limited dealing with each other, the ordinary course of business between them is minimal at best.  In support of its Motion, Buffalo Molded looks to the terms as stated on the invoices.  The terms are in the alternative, "Net 30 or within 90 days of PPAP." *Br. in Supp. of Pl's Mot. for Summ. J.,* p. 9, Ex. F.  It is the Court's understanding that PPAP refers to "Production Parts Approval Process."  The majority of invoices however only included the term "Net 30."  *Id.,* Ex. A.  The transfers were made more than 60 days after the last invoice issued by Omega to the Debtor.  There is no dispute that October 13, 2004 was the date of the transfers.  The last invoice from Omega (other than for the NM tools as discussed, below) was dated August 9, 2004. Accordingly, the transfers were not within the term, "Net 30 days."

As to the invoices requiring "PPAP" approval, Buffalo Molded asserts that at the time of the wire transfer, the ND Program had not yet received PPAP approval.  *Br. in Supp. of Pl.'s Mtn.*

20

*For Summ. J.*, p. 9; Ex. G. In support, it provides the testimony of Nicholas Bogdanos.[7] In addition, the testimony of John O'Neill indicates that PPAP had not occurred as of the date of transfer. *Id.*, Ex. J. Omega disputes this and further indicates that the deposition testimony of Nicholas Bogdanos and John O'Neill upon which Debtor is relying likely involves inadmissable hearsay. *Def.'s Mem. Obj. and Resp. to Pl.'s Mtn. for Summ. J.*, p. 16. To the contrary, Omega contends that Mark Andreozzi, was told by one of Debtor's employees that PPAP approval occurred on Aug. 15, 2004. *Id.*, Ex. 9, p. 3.

In response to Buffalo Molded's Motion, Omega refers to the limited history between the parties as established by the payments on the Isuzu tooling. It asserts that the average amount of time for payment for the Isuzu tooling was thirty (30) to thirty-five (35) weeks after invoice. *Def.'s Mem. Obj. and Resp. to Pl.'s Mtn. for Summ. J.,* p.15; Ex. 6. Omega claims the time of payment for the ND Tools was twenty-nine (29) weeks after invoice. *Id*.

The limited history between the parties provides difficulty assessing what was ordinary between them. The invoice and payment history reflects only four invoices prior to the time of the wire transfers in question. In addition, no information was provided regarding the terms of the prior invoices associated with the Isuzu tooling, such as whether the terms were "Net 30 days or required PPAP approval." Nor does the Court have information as to whether the tooling was sent back and forth between the parties as was the case with the ND Tooling. Accordingly, reference to

---

[7]

Q:    ...Do you know whether PPAP occurred before or after the ND cargo sill was delivered?
A:    I don't even know if the ND is PPAP'd today as we speak. It was never PPAP'd when I left there April 4th.
Q:    then for sure when the ND cargo sill was paid for, it wasn't PPAP'd, correct?
A:    No, it wasn't.
*Id.* Ex. G., p. 42.

the invoicing and payment of the Isuzu tooling provides limited assistance.  There is also a disputed

fact as to whether PPAP approval even occurred at the time of the transfers.  Accordingly, as between

these two parties, a genuine dispute as to material fact regarding the application of *11 U.S.C.*

*§547(c)(2)(B)* exists on the current record.

The Report of Michael D. Faloon submitted by Omega opines about the industry's

ordinary course of business. His opinion paints a rather startling picture of the plastic mold industry.

He submits that payment terms are seldom if ever followed and that the industry has a general lack

of discipline when it comes to payment and payment terms.

> The Industry's general lack of discipline in adherence to
> written documents with regards to timing, approvals, and
> payments are widely ignored among and between affected
> parties such that the agreements as written are meaningless.
> The Industry's tooling payment process varies widely in
> most instances and might [be] summarized by the following
> contemporary quotes; "the squeaky wheel gets the grease..."
> and "you'll get yours when I get mine..."

*Br.  In Supp.  Of Def.'s Mtn.  For Partial Summ.  J.,* Ex. L, p. 6.

Further, according to Mr. Faloon, the industry practice typically abrogates written

agreements to arbitrary provisions.  *Id*., p. 7.  If the opinion of Mr. Faloon is an accurate assessment

of the industry, the Court is unclear how the defense of ordinary course of business could ever be a

viable one concerning transfers in this industry.  Based on this report, in this business it would appear

that there simply is no ordinary course.  As such, on the current record the Court believes a genuine

dispute of material fact exists in regard to proof of the elements of *11 U.S.C. §547(c)(2)* as well.

### *CONCLUSION*

Genuine issues of material fact exist that prevent the Court from deciding the numerous issues raised by the Parties on the basis of summary judgment. Therefore, for the foregoing reasons, the *Motion for Summary Judgment* filed by Plaintiff Buffalo Molded Plastics, Inc. will be denied and the *Motion for Partial Summary Judgment* filed by Defendant Omega Tool Corp. will also be denied.

An appropriate Order of Court shall issue.

Dated: June 28, 2006

Thomas P. Agresti
U. S. Bankruptcy Judge

cc: Case administrator to serve:

Ryan D.  Heilman, Esq.
Schafer and Weiner, PLLC
40950 Woodward Ave., Ste.  100
Bloomfield Hills, MI 48304

Beverly Weiss Manne, Esq.
Tucker Arensberg, P.C.
1500 One PPG Place
Pittsburgh, PA 15222

Willard E.  Hawley, Esq.
McDonald Hopkins Co., LPA
30150 Telegraph Rd., Ste 225
Bingham Farms, MI 48025

David Salzman, Esq.
Campbell & Levine
1700 Grant Building
Pittsburgh, PA 15219

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

IN RE:

| | | |
|---|---|---|
| BUFFALO MOLDED PLASTICS, INC., | : | Case No. 04-12782 TPA |
| d/b/a/ ANDOVER INDUSTRIES, | : | |
| Debtor, | : | Chapter 11 |
| | : | |
| BUFFALO MOLDED PLASTICS, | : | Adversary No.  05-01041 TPA |
| INC., d/b/a/ ANDOVER | : | |
| INDUSTRIES, | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| OMEGA TOOL CORP., | : | |
| Defendant | : | |

**ORDER OF COURT**

AND NOW, this *28th* day of *June, 2006*, for the reasons expressed in the Memorandum Opinion of even date, it is hereby **ORDERED, ADJUDGED and DECREED** that the **Motion for Summary Judgment** filed by the Plaintiff Buffalo Molded Plasatics, Inc. is **DENIED** and the **Motion for Partial Summary Judgment** filed by Defendant Omega Tool Corp. is **DENIED** and**.**

Thomas P. Agresti
U.S. Bankruptcy Judge

cc: Case administrator to serve:

Ryan D.  Heilman, Esq.
Schafer and Weiner, PLLC
40950 Woodward Ave., Ste.  100
Bloomfield Hills, MI 48304

Beverly Weiss Manne, Esq.
Tucker Arensberg, P.C.
1500 One PPG Place
Pittsburgh, PA 15222

Willard E.  Hawley, Esq.
McDonald Hopkins Co., LPA
30150 Telegraph Rd., Ste 225
Bingham Farms, MI 48025

David Salzman, Esq.
Campbell & Levine
1700 Grant Building
Pittsburgh, PA 15219